## AFFIDAVIT IN SUPPORT OF
## AN APPLICATION FOR A SEARCH WARRANT

I, Robert Jacobsen, being first duly sworn, hereby depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1.      I make this affidavit in support of an application for a search warrant to be executed on a blue Honda Accord with Massachusetts license plates 634AM1 (the "TARGET VEHICLE"). As set forth below, this is believed to be the vehicle of Marvin Smith, and the TARGET VEHICLE is further described in Attachment A.

2.      I am a Special Agent with the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") and have been so employed since November, 2017.  I received 15 weeks of Criminal Investigator training at the Federal Law Enforcement Training Center and 17 weeks of ATF Special Agent training at the ATF National Academy.  I was trained in federal criminal law, firearms, and criminal investigation techniques.  Since joining ATF, I have investigated federal firearms violations, including participating in the controlled purchases of firearms, surveillance of firearms traffickers, interviews of suspects, participating in search warrants, and electronic surveillance. I have investigated acts of violent crime and violations of the federal firearms laws, analyzing firearms trace data, cellular phones, and email accounts.  Prior to my employment with the ATF, I was employed for approximately two-and-a-half years as a Deputy Sheriff with the Loudoun County Sheriff's Office in Loudoun County, Virginia.  For approximately the last year of that employment, I operated as a member of the Special Operations Unit, a full-time SWAT team and Street Crimes Criminal Suppression Unit. I was trained and certified by the Columbus Police Department as a SWAT operator and hold numerous training certificates in domestic and foreign weapon systems, street crimes, criminal narcotic operations, and gang organizations. Prior to joining the Special Operations Unit, I spent approximately one-and-a-half years in a

Patrol function, responding to public emergency calls for service, investigating crimes, and testifying in court. I graduated from the Northern Virginia Criminal Justice Academy with Virginia state certifications as a Police Officer and Jail Corrections Officer. I received a Bachelor's of Science Degree from George Mason University.

3.     The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents, officers, and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

4.     Based on the facts set forth in this affidavit, there is probable cause to believe that violations of 18 U.S.C. § 1951[1] have been committed, are being committed, and will be committed by **KEITH COUSIN** and **RICO PERRY**. As is also described more fully below, I assert there is probable cause to believe that evidence of **COUSIN'S** and **PERRY's** conspiracy to commit a Hobbs Act violation exists inside of the TARGET VEHICLE, including but not limited to firearms, ammunition, burglarious tools, masks, and gloves, and other items as described in Attachment B to this affidavit.

---

[1] 18 U.S.C. § 1951 (the Hobbs Act) prohibits the obstruction of commerce by robbery – *i.e.*, by the unlawful taking or obtaining of personal property from the person or in the presence of another, against his will, by means of actual or threatened force, or violence, or fear of injury. I am aware that courts have determined that even illegal commerce counts as commerce for Hobbs Act purposes, and that courts have also found that drug trafficking affects interstate commerce and that the Commerce Clause of the U.S. Constitution gives the federal government the authority to regulate and control the possession and distribution of controlled substances.

## TARGET VEHICLE

5.     The TARGET VEHICLE is a blue Honda Accord bearing Massachusetts license plate 634AM1. On January 28, 2020, **COUSIN** and **PERRY** arrived in the TARGET VEHICLE, being involved with the planning of, and arriving with the intention to, commit a robbery affecting interstate commerce.

## PROBABLE CAUSE

6.     The investigation into **COUSIN** was initiated in October of 2019 when a Confidential Informant[2] (the "CI") made ATF Agents aware that **COUSIN** has a history of robberies and was actively and frequently participating in home invasions and robberies in Boston, Massachusetts. The CI advised that **COUSIN** is a member of the Columbia Road street gang who was most recently charged with Murder and found Not Guilty in a jury trial in May of 2019. The CI explained that **COUSIN** is a violent and unpredictable Columbia Road gang member who has previously committed, and continues to commit, robberies and home invasions in Boston.

7.     My investigation into **COUSIN** corroborated the information provided by the CI, in that **COUSIN** is a documented member of the Columbia Road street gang. The Columbia Road street gang uses clothing, colors, and symbols to represent the gang. Like other members of the gang, **COUSIN** bears a "CR" tattoo. According to the Boston Regional Intelligence Center

---

[2] The CI has a criminal history that includes prior firearm and drug distribution convictions. On previous occasions, the CI has accurately identified and corroborated events and individuals involved in active criminal investigations. At the direction of law enforcement, the CI has conducted controlled purchases of evidence in conjunction with criminal investigations. The CI is being paid for her/his services and information provided.

("BRIC"), there are forty verified members and associates of the gang. Boston Police Department ("BPD") verifies gang members and has verified **COUSIN** as a member of the Columbia Road street gang. Investigation into **COUSIN** and other members of the Columbia Road gang show a long and violent history of firearms and armed robbery crimes. **COUSIN** was first arrested by BPD in 2000 for Armed Robbery and has been arrested 34 times since then.

8.      Further investigation into **COUSIN** corroborated the CI's intelligence that **COUSIN** has a long history of committing robberies and violent acts. A records check of **COUSIN's** criminal history, as kept by the Massachusetts Board of Probation, includes a 2010 conviction for Possession of a Firearm and Possession of Ammunition, a 2008 conviction for Assault and Battery with a Dangerous Weapon, a 2005 conviction for Possession of a Firearm, a 2003 conviction for Possession of a Firearm, a 2002 conviction for Armed Robbery and Assault with a Dangerous Weapon, a 2001 conviction for Breaking and Entering at Night with Intent to Commit a Felony and Larceny, and a 2001 conviction for Unarmed Robbery. In addition to the aforementioned criminal convictions, **COUSIN** has been arrested numerous other times for firearms, robbery, and drug offenses, among other crimes.

9.      The CI further explained that **COUSIN** was recently casing potential targets for robberies. Based on my training and experience, I know the term "casing" to refer to taking measures to determine the worthiness of a target prior to conducting a robbery and to plan the methods for carrying out such a robbery. The CI explained that **COUSIN** is actively requesting that people locate drug dealers who possess, control, or store money and/or narcotics at a particular location – often known as a "stash house" – and report back to **COUSIN** with the information. The CI further explained that, as recently as October 2019, she/he was requested by **COUSIN** to make such a phone call, attempting to contact a third-party seeking information

4

related to a potential stash house. Based upon the CI's description of **COUSIN's** conduct, and

based on my training and experience and my familiarity with **COUSIN's** criminal history and

gang activity, I believe that **COUSIN** is actively seeking targets for robberies involving drugs,

drug dealers, and/or drug proceeds.

10.    On October 20, 2019, BPD responded to a home invasion where four black males

forced their way into a residence with firearms and zip-tied the occupants (to include children

and elderly). One suspect made several threats to shoot one of the victims in front of his kids,

while another suspect collected the victim's cell phones. Wearing latex gloves, the males were in

the process of taking cell phones and smart watches away from the victims when officers arrived

at the residence. Two suspects were arrested and two fled the scene. Three firearms were

recovered from the suspects at the residence. According to BPD Detectives, the description

provided for one of the fleeing suspects matches the description of **COUSIN**, to include a

detailed account of a chipped tooth, similar to that of **COUSIN**.[3]

11.    On November 26, 2019, I met with the CI. At the direction of law enforcement.

the CI agreed to make a recorded phone call to Keith **COUSIN** to initiate a conversation

regarding **COUSIN's** interest in participating in a potential robbery plan. **COUSIN** answered

the call and explained to the CI that he did not want to talk over the phone and asked the CI to

call back from the FaceTime video chat application. I initiated an audio recording device to

record the audio conversation between **COUSIN** and the CI while they communicated over

---

[3] The CI described COUSIN as having a chipped tooth. A BPD Detective familiar with
COUSIN corroborated this description. Based on the independent corroboration of certain
information that the CI has provided about COUSIN, I deem that this information -- and other
information provided by the CI regarding COUSIN -- is reliable.

FaceTime video chat. The CI then initiated a FaceTime call with **COUSIN**, and **COUSIN** answered the call.

12.     The CI told **COUSIN** that she/he had "a quick scheme" and told **COUSIN**, "I need somebody man." The CI then admitted to **COUSIN**, "I know we're not on good terms" but explained that this situation involved money, referring to money as "bread." **COUSIN** asked the CI, "like what?" The CI answered, "like a come up," referring to the potential for a robbery. **COUSIN** responded asking the CI, "What made you call me out of all people, knowing that we ain't on good terms?" The CI answered, "Because I know what you do…" **COUSIN** responded, "I know." **COUSIN** and the CI then began to discuss their past. **COUSIN** then asked the CI more about the robbery information. The CI told **COUSIN** that her/his people were coming into town and "fuckin' with some n****s." **COUSIN** then stopped the CI and explained he was with his people and that he would call the CI back on FaceTime at a later time to "really chop it up, and really have a heart to heart."

13.     On November 27, 2019, the CI informed ATF that she/he had received a FaceTime video call from **COUSIN**, inquiring for more information regarding the previously discussed robbery plan. I subsequently interviewed the CI about the details of that video phone call. The CI told me that **COUSIN** told the CI that he could not stop thinking about what they discussed during their previous phone call regarding a potential robbery, and wanted more details. The CI further explained that **COUSIN** made the unprompted statement, "if you got this lick for us, let's do it." Based on my training and experience, and that of other agents, I know the term "lick" to be a common slang term used for a robbery. At the direction of law enforcement, the CI explained to **COUSIN** that she/he knew people from out of state who would be coming into town and "had something good lined up." The CI further explained that these people had

done this before a couple years ago and it worked out very well, referring to a robbery. The CI also mentioned that it should work out well this time.

14.    On December 17, 2019, the CI was directed by law enforcement to call **COUSIN** and attempt to confirm a time of day for a planned controlled meeting between the CI and **COUSIN**. In substance and among other things, the conversation included the following. The CI told **COUSIN** that she/he wanted to discuss what they had previously spoken about in prior conversations, eluding to discussions about participating in a robbery. **COUSIN** told the CI that he understood the nature of the topic and asked for more details. The CI told **COUSIN** that things were falling into place for the robbery and attempted to arrange for an in-person meeting to discuss further details. **COUSIN** asked the CI how she/he knew the person who was to be planning the robbery. The CI provided a prepared narrative, at the direction of law enforcement, regarding their relationship. The CI explained that the person "had beef" with some of her/his own people and was planning to rob them. **COUSIN** then attempted to seek further information regarding the possible fruits of the robbery. **COUSIN** told the CI, "…so it's like a double-cross," then stating, "that's going to be like taking candy from a baby."

15.    On January 7, 2020, SA Carlos Valles, acting in an undercover capacity, met with **COUSIN**. The purpose of this meeting was to ascertain **COUSIN's** interest in committing an armed robbery of a narcotics stash house. The CI was also present at this meeting as she/he was responsible for making the introduction between **COUSIN** and SA Valles.

16.    In substance and among other things, the conversation that took place during the meeting included the following. SA Valles explained to **COUSIN** that he was a disgruntled cocaine courier who works for a Mexican-based Drug Trafficking Organization (DTO that was seeking to expand its operations to the New England area. SA Valles stated that the DTO

maintained "stash" houses containing "quality cocaine." SA Valles then explained that he was

responsible for transporting two (2) kilograms of cocaine for the DTO, to which **COUSIN**

acknowledged that he understood by stating, "Oh, so you're the courier." SA Valles

affirmatively acknowledged. SA Valles then explained that every time, while collecting the

cocaine at the stash houses, SA Valles observed at least ten (10) "kilos" of cocaine. SA Valles

stated that every time he entered the stash house, there were always the same two guards at the

residence, one of whom was always armed with a "pistol on his hip". **COUSIN** then stated,

"Play it like they both got guns" and advised SA Valles to continue explaining. SA Valles then

explained that when he entered the stash house, one of the guards would retrieve two (2) kilos

from a back room, hand them to SA Valles, and then provided SA Valles with the destination

location.

17.     SA Valles went on to explain that the DTO had not provided payment to SA

Valles for the last two (2) occasions that SA Valles had transported the kilos of cocaine, and that

was the reason SA Valles was looking for someone to rob the stash house. Additionally, SA

Valles advised that this would be the first time he would be conducting a transport for the DTO

in this area, and because the DTO was making him come all the way to the Boston area from El

Paso, TX, it was yet another reason he was disgruntled. **COUSIN** affirmatively acknowledged.

**COUSIN** told SA Valles that he could have not picked someone better (than himself) to conduct

the robbery. **COUSIN** further stated that he understood he was dealing with people who "the

cartel entrusted to watch they drugs" and that there would definitely have to be some type of

"hostile takeover."

18.     On January 8, 2020, SA Valles and the CI met **COUSIN** and another individual at

a Boston-based hotel. That person introduced himself to SA Valles as "E". I obtained still

8

photographs of the individual accompanying **COUSIN** to the hotel. I provided photographs of that individual to Suffolk County Sheriff's Office Lieutenant and ATF Task Force Officer (TFO) Keith Medeiros. TFO Medeiros contacted employees of the Massachusetts Department of Corrections (DOC), who were able to positively identify the individual in the photographs as **RICO PERRY.** I located **PERRY's** photograph, as maintained by the Massachusetts Registry of Motor Vehicles (RMV), and showed it to SA Valles. SA Valles identified **PERRY** as the individual in the hotel room with him on January 8, 2020.

19.     I have reviewed Rico **PERRY's** criminal history, as maintained by the Massachusetts Board of Probation, which includes a 2013 conviction for Intimidation, 2009 convictions for Armed Assault with Intent to Murder, two counts of Breaking and Entering with Intent to Commit a Felony, Larceny of a Motor Vehicle, and 2006 convictions for two counts of Assault and Battery.

20.     In substance and among other things, the conversation that took place in the hotel room included the following. **COUSIN** advised SA Valles that **PERRY** was his "peoples." SA Valles affirmatively acknowledged and then asked **PERRY** if **COUSIN** had advised him of "what was going on". **PERRY** replied that he only been "briefly" advised and that he was present to hear the details [relative to the armed robbery] from SA Valles. SA Valles then asked **PERRY** if he hit "licks", which in this context is a street vernacular term commonly used to refer to a home invasion style, armed robbery. **PERRY** replied by nodding in the affirmative and stating, "Yeah." SA Valles then proceeded to explain that he was a disgruntled cocaine courier, who works for a Mexican based DTO that was seeking to expand its operations to the New England area. SA Valles explained that the DTO maintained stash houses containing "pure cocaine". SA Valles then stated that he was responsible for transporting two (2) "kilos" of

cocaine for the DTO, to which **PERRY** affirmatively acknowledged by stating, "Okay". SA

Valles added that every time, while collecting the cocaine at the stash houses, SA Valles

observed at least ten (10) "kilos" of cocaine. SA Valles stated that every time he entered the

stash house, there were always the same two guards at the residence, one of whom was always

armed with a "pistol on his hip". SA Valles then explained that when he entered the stash house,

one of the guards would retrieve two (2) kilos from a back room, hand them to SA Valles, and

then provide SA Valles with the destination location. SA Valles asked **PERRY** if he understood

what he had explained thus far, to which **PERRY** affirmatively acknowledged by stating, "Mm

hmm."

    21.    SA Valles went on to explain that the DTO had not provided payment to him for

the last two (2) occasions that he had transported the kilos of cocaine, and that was the reason SA

Valles was looking for someone to rob the stash house. Additionally, SA Valles advised that this

would be the first time he would be conducting a transport for the DTO in this area and because

the DTO was making him come all the way to the [Boston] area, it was yet another reason he

was disgruntled. **COUSIN** then stated to **PERRY** that this meeting was necessary because,

"When it comes to life changing situations, it's that much more in the planning." He continued

by stating, "If you ain't planning, you planning to fail." **PERRY** affirmatively acknowledged.

SA Valles then proceeded to explain that the DTO utilizes vacant, single family houses to stash

the cocaine, and that the DTO never utilizes the same location as a stash house.  SA Valles also

said that they never keep "cash" in the same stash houses used for the cocaine. **PERRY**

affirmatively acknowledged that he understood by stating, "They ain't gonna do that… getting

caught with both ain't gonna help no one."

22.     **PERRY** and **COUSIN** then asked SA Valles the manner in which he was greeted by the armed guards when SA Valles arrived at the stash house. Specifically, **PERRY** asked if the guard who SA Valles knew for sure to be armed was the guard who answered the door. SA Valles then explained that the guard who was not visibly armed was the guard who always answered the door, while the visibly armed guard remained immediately behind him.  SA Valles further explained that the same guard who answered the door was the same one who would shut the door behind SA Valles after he entered. **PERRY** then expressed concern that the visibly armed guard would not be able to be immediately addressed because he was behind the other guard and could very possibly be able to "get the gun" on **PERRY** and **COUSIN**.  **COUSIN** agreed and suggested that more planning had to be done in the meantime (prior to the robbery being conducted). **COUSIN** stated that they (he and **PERRY**) knew that the target of the robbery was not going to be "crumbs" and SA Valles reiterated that the target of the robbery would be ten (10) [kilos of cocaine]. SA Valles then discussed the split of the proceeds of the robbery with **COUSIN** and **PERRY** and suggested that the proceeds be divided "fifty-fifty".  **COUSIN** agreed by stating, "Of course."

23.     **PERRY** then revisited the manner in which SA Valles entered the stash house. SA Valles reiterated what he had previously explained and **COUSIN** and **PERRY** then began to discuss how they thought the robbery should be conducted. Specifically, **COUSIN** was of the opinion that they should rob SA Valles after he came out of the house. **COUSIN** explained that he would rather have a sure thing, that being the "two bricks" that, SA Valles would be coming out of the house with, than have nothing at all. (In this context "brick" is a street vernacular term commonly used to refer to a kilo of cocaine), PERRY was of the opinion that they would have to make entry into the house, regardless.  **PERRY** then stated, "I'm going in there... I ain't

11

playing." He added that upon entering the house, he immediately wanted to put a "gun" to the first guard's head, take him "hostage," and use him as a "shield" so that the guards could be subdued so as not to "let off a shot". **COUSIN** agreed with the notion of the guards not being able to shoot and stated, "That's the key to any robbery on earth." **PERRY** ultimately stated to **COUSIN**, "If you don't get the situation under control, nothing's going right."

24.    SA Valles then stated that he had one more detail to advise **COUSIN** and **PERRY** of. SA Valles stated that the kilos were "stamped" with either a little "horse" or a "spider". **PERRY** then interjected and asked, "Don't serve 'em pure?" SA Valles affirmatively acknowledged and stressed that he needed to know that **COUSIN** and **PERRY** would not attempt to sell an entire, stamped kilo of cocaine, prior to breaking it down, so as not to raise suspicion as to where the kilogram came from. Both **COUSIN** and **PERRY** acknowledged they understood SA Valles did not want the stamp to be on the streets. **COUSIN** stated that he would not even be robbing someone of their "drugs" if he did not have the means to distribute it, and **PERRY** added that his portion of the cocaine was going "straight to the stove," which in this context is a street vernacular phrase commonly used to refer to converting powder cocaine into crack cocaine. **COUSIN** then asked SA Valles, "You can turn one into two anyway, right?" SA Valles affirmatively acknowledged, and as he began to talk about the situation when the kilo was broken open, **PERRY** interjected and asked if the all the "pink," "crystals" and "flake" could be seen inside of the kilo. SA Valles affirmatively acknowledged and added that the cocaine was "fish scale," which in this context, is a street vernacular term commonly used to refer to a very high-quality cocaine, usually right off the kilogram, that is uncut. Both **COUSIN** and **PERRY** laughed. **COUSIN** then assured SA Valles that this type of job would require two (2) member, with "machine guns" and a third member with a "handgun." SA Valles affirmatively

12

acknowledged and advised **COUSIN** that he would stay in contact until the robbery was to be conducted.

25.     On the morning of January 28, 2020, COUSIN initiated a phone call to the CW. I was present during the phone call and heard the conversation. COUSIN asked the CW where he was at the moment and advised that he was ready to meet with SA Valles later that day. COUSIN advised the CW that his "people" were ready, eluding to the robbery that was scheduled for that day. The CW advised that the CW was going to meet SA Valles and call COUSIN when they were ready to meet.

26.     Later that morning, SA Valles initiated a phone call to COUSIN advising that they should meet in the parking lot of the Hilton Garden Inn, where they had met during previous controlled meetings. COUSIN advised that he was on the way and would meet at the hotel. Agents observed a blue Honda Accord with Massachusetts license plates 634AM1 park across the street from the hotel. A black male, matching the height and weight description of COUSIN, wearing a hood, exited the vehicle and began looking around the area. That individual, later identified as COUSIN, turned around and returned to the vehicle, and drove away from the area.

27.     The blue Honda Accord with Massachusetts license plates 634AM1, is registered to Marvin Smith, with a registered address of 86 Silsbee Street, #3, Lynn, MA.  Smith is known by Agents to be the step-father of COUSIN, and during a previous interaction on January 7, 2020, COUSIN was picked up at 86 Silsbee Street by the CW. COUSIN explained to the CW that he resides at that address.

28.     Once COUSIN left the area in the vehicle, COUSIN called SA Valles and informed him that he saw what he thought was a police car in the area. COUSIN further explained that he did not want to meet in that parking lot anymore.  SA Valles directed COUSIN

to a storage facility where they could meet and talk further. COUSIN advised that he would meet SA Valles at the storage facility. COUSIN drove the blue Honda Accord to the storage facility and exited the vehicle with PERRY.

29.     COUSIN and PERRY advised SA Valles that they were prepared to conduct the robbery. COUSIN further explained that his "driver" was in the area and ready, and waiting. SA Valles asked COUSIN and PERRY if they had their guns. COUSIN advised that their firearms were in the vehicle with the "driver." SA Valles suggested that the "driver" also meet at the storage facility so everyone could be on the same page with the robbery plan.

30.     COUSIN and PERRY returned to their vehicle, the blue Honda Accord, and exited the facility explaining that they would go get the "driver." After exiting the storage facility COUSIN called and informed SA Valles that they would return in 10 minutes with the "driver." During that phone call, Agents observed COUSIN driving the blue Honda Accord through a nearby Burger King parking lot.

31.     Without notice, COUSIN and PERRY returned to the storage facility in the blue Honda Accord. Different from the previous time, COUSIN and PERRY parked their vehicle on the backside of the storage unit and approached SA Valles on foot. SA Valles explained that he had rented a storage unit to use as a known place to meet up after the robbery. SA Valles also explained that he had rented another car that they could use for the robbery if they preferred. COUSIN told SA Valles that he was smart for providing the car and storage unit. COUSIN also asked SA Valles for some gas money because he didn't want to have anything on him, not even his wallet. SA Valles, COUSIN, and PERRY, opened up the storage unit and entered inside. While inside of the storage unit, COUSIN and PERRY overtly showed to SA Valles that they

14

were not wearing any wires by removing some of their clothes. SA Valles was encouraged to do the same and removed some of his clothes to show he was also not wearing a wire.

32.     COUSIN and PERRY explained that the "driver" was nearby. COUSIN and PERRY exited the inside of the storage unit and explained to SA Valles that they wanted to take the rental vehicle to pick up the "driver" and guns. ATF Agents commenced an arrest of COUSIN and PERRY and both individuals were taken into custody.

33.     Based on the foregoing, I believe that **COUSIN** and **PERRY** have been involved in certain robberies affecting interstate commerce and actively conspired, being involved with the planning of and arriving in the TARGET VEHICLE with the intention to, commit a robbery affecting interstate commerce.

34.     I further request that the Court order that all papers in support of this application, including the affidavit and search warrant, be sealed until further order of the Court. These documents discuss an ongoing criminal investigation that is neither public nor known to all of the targets of the investigation. Accordingly, there is good cause to seal these documents because their premature disclosure may seriously jeopardize that investigation, including by giving targets an opportunity to destroy or tamper with evidence, change patterns of behavior, notify confederates, and flee from prosecution.

Respectfully submitted,

Robert Jacobsen
Special Agent
ATF

Subscribed and sworn to before me on January 28, 2020

HON. MARIANE B. BOWLER
UNITED STATES MAGISTRATE JUDGE

16

## ATTACMENT A

## LOCATION TO BE SEARCHED

The SUBJECT VEHICLE is a blue Honda Accord assigned Massachusetts registration 634AM1

## **ATTACHMENT B**

### **ITEMS TO BE SEIZED**

All records, in whatever form, and tangible objects that constitute evidence fruits, or
instrumentalities of violations of  18 U.S.C. § 1951 (Hobbs Act robbery), including the
following:

1)  firearms,

2)  ammunition,

3)  pipes, clubs, or other objects that may be used to assault an individual or gain
access to a building;

4)  masks and handkerchiefs,

5)  gloves; and

6)  cell phones